## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**SHAWN TEMPLE,**

     **Plaintiff,**

**v.**                      **CASE NO. 3:19cv2989-MCR-HTC**

**CITY OF CRESTVIEW,**

     **Defendant.**

_____/

## <u>ORDER</u>

Plaintiff Shawn Temple filed suit against his former employer, Defendant City of Crestview ("City"), alleging he was terminated from the Crestview Police Department in retaliation for disclosing and reporting misconduct and discrimination, in violation of Florida's Whistle-blower's Act, Fla. Stat. § 112.3187; Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-3(a); and the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10(7).[1] The City moves for summary judgment, ECF No. 30. On careful review, the Court finds that the motion is due to be denied.

---

[1] Temple brought suit in state court, and the City removed the case based on federal question jurisdiction. *See* 28 U.S.C. § 1331.

## I.   Background[2]

Shawn Temple began his employment as a law enforcement officer with the Crestview Police Department in 2012. He was promoted to the Criminal Investigation Division after two years, and in December 2017, he received Internal Affairs training and began working as an investigator in the Professional Standards Division. The City terminated Temple's employment on August 28, 2018, based on an Internal Affairs Investigation ("IA"), sustaining nine violations against him, and a separate determination that Temple had been untruthful during that investigation. Temple claims he was terminated in retaliation for disclosing acts of misconduct and discrimination by two members of the command staff. The relevant events are described below.

### A.   Oral Report to Mayor Cadle

On April 23, 2018, Temple met with Mayor David Cadle for 30-40 minutes. Temple was one of more than 25 officers who met with the Mayor in April 2018 to discuss Police Department leadership and morale. ECF No. 28-3 at 33. According to Temple, Chief Taylor told him to meet with the Mayor, saying only that the Mayor

---

[2] For the limited purpose of this summary judgment proceeding, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party," which in this case is the Plaintiff. *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal marks omitted). The Court is mindful that what are "considered to be the 'facts' at the summary judgment stage may not turn out to be the actual facts if the case goes to trial." *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).

was conducting interviews with department employees, with no other context or background. Temple said he discussed several issues with the Mayor, including his perceptions of favoritism in the department. He also took the opportunity to discuss concerns over complaints he had heard against Deputy Chief Richard Brown and Commander Andrew Schneider. *See* ECF Nos. 33-1 at 12-15; 28-12 at 1-2. In particular, Temple disclosed a report by a former City employee (Heather Watson) that she was the subject of sexual harassment by Brown and a complaint by Officer Christina Dawson that she suffered discrimination by Schneider. Temple reported that Dawson had complained of being treated differently than male officers in that she was held to a higher standard, denied training, given the oldest patrol cars, and was constantly being transferred to different shifts.

According to Mayor Cadle, in April 2018, officers had asked to come see him privately with concerns about a new work schedule and complaints of being "passed over." ECF No. 28-3, at 9-10. Cadle also testified that even before this, he had become concerned about Chief of Police Tony Taylor's performance. During his meetings with officers, Cadle asked them questions about department leadership and morale.[3] *See* ECF No. 28-3 at 33.

---

[3] Cadle testified that Dawson was also one of the officers who came to discuss police morale. (The record, however, is not clear on the timing of her meeting in relation to Temple's meeting with the Mayor). She complained of unfair treatment by Schneider, such as not being offered training that male officers were given. Cadle said he then went to Schneider, inquired about the matter, and asked Schneider for a full report stating, "I wanted it in writing." ECF No. 28-3 at 34-36. On May 6, 2018, Chief Taylor sent Cadle an email about Dawson's complaints.

## B.     Speck Pond Meeting and IA Investigation

On May 8, 2018, a meeting of a small group of Crestview City Police Department Officers occurred following a K-9 training at Speck Pond, which was outside the City limits.[4]  Present at the meeting were Crestview Police Department Officers Temple, Dawson, Jay Seals, Nate Marlar, Joshua Ellrick, and a former employee, Shane Kriser.  According to Temple (as discussed further below), he was unaware of the purpose of the meeting until he arrived and learned that Dawson intended to discuss a list of approximately 31 complaints she had about conduct toward her by Commander Schneider and Commander Jamie Grant.  ECF No. 33-1 at 23 (Temple Depo.).  Commander Schneider had heard about the meeting in advance and informed the Mayor that it was organized by Dawson and Chief Taylor and that the purpose was to "dig up dirt" on him (Schneider) and Grant to get them fired.[5]  ECF No. 28-4 at 56 (Schneider Depo.).  The Mayor then called a command staff meeting for the same evening to address dysfunction within the Police Department, with Taylor, Schneider, Brown, and Grant present.[6]  Cadel said it was

---

Cadle said he instructed Taylor to get documents "on every event of every aspect of the complaint and be as specific as possible." *Id*. at 37.

[4] Speck Pond is a location on Eglin Air Force Base, approximately 18 miles east of Crestview, Florida.

[5] Schneider learned this from an officer named Chase Rawles, who had heard it from another officer named Evan Reynolds.  *See* ECF No. 28-4 at 56 (Schneider Depo.).

[6] Grant stated by affidavit that there had been dysfunction in the Police Department since 2012 and that Chief Taylor had taken over at that time and fixed many problems.  He stated that

a contentious meeting discussing "dissention in the ranks" and rumors of "secret meetings" and that Brown asserted Taylor was the cause of the dysfunction.  ECF No. 28-3 at 19-20.

The following morning, May 9, 2018, Chief Taylor conducted a sworn interview with Temple about Dawson's complaints, consistent with the Mayor's prior instructions.[7]  *See generally*, ECF No. 28-3 at 37 (stating on May 6, the Mayor had instructed Taylor to gather information on Dawson's complaints); *supra* Note 3.

Also on May 9, 2018, Schneider sent a memo to Deputy Chief Brown detailing a telephone call he had received the previous night from Officer Marlar, who had attended the Speck Pond meeting.  According to Schneider's memo, Marlar had received a text message saying Chief Taylor had mandated the meeting, that Marlar had spoken in person with Temple "about the alleged plans for a clandestine[8] meeting," and that Marlar "expressed great concern."  Marlar told him that officers attending had discussed allegations that he (Schneider) had not allowed

---

in 2017, he began to hear reports of favoritism and retaliation within the department, which created conflict and low morale problems.  *See* ECF No. 28-17 at 2-3.

   [7] In this interview, Temple detailed his knowledge of occurrences in the department that Dawson had perceived as a pattern of discrimination, such as Schneider denying her permission to attend a speed measurement course or to attend general instructor school, and in each instance, a male officer was allowed to attend instead. ECF No. 28-8, at 2, 7. Mayor Cadle testified, however, that he did not receive any evidence from Chief Taylor after instructing him to gather information on Dawson's complaint, ECF No. 28-3, at 37, and Grant denied seeing this sworn statement until during discovery for this case, ECF No. 28-17.

   [8] Schneider testified that "clandestine" was his word.  ECF No. 28-4 at 69-70.

Dawson to attend Instructor Techniques Training.[9]  Schneider also wrote that Marlar thought the Speck Pond meeting was "shady" and "nothing more than an attempt to sabotage [Schneider's] and other officer's [sic] careers."  ECF No. 28-9 at 3.  At the end of the memo, Schneider included a list of several violations that had possibly occurred by his subordinate officers who had attended, and his opinion that Chief Taylor had lied to command staff the previous night by stating he was completely unaware of the meeting.  Brown sent Schneider's memo to the Mayor. The same day, Mayor Cadle placed Chief Taylor on administrative leave and appointed Commander Grant as Interim Chief.  The Mayor terminated Taylor's employment in June.

On May 10, new Interim Chief Grant initiated an IA investigation and placed Temple, Dawson, and Seals, whom he believed to be the "ring leaders" of the secret meeting at Speck Pond, on administrative leave.[10]  ECF No. 28-17 at 5.  Grant appointed Administrative Sergeant Mike Leadmon to conduct the investigation.[11]

---

[9] In the memo, Schneider included his explanation for why he had treated Dawson differently with regard to the training, in part explaining that she was allowed to attend a Field Training Officer Course.  ECF No. 28-9 at 2.

[10] Mayor Cadle testified that he had no involvement in the decision to place Temple, Seals, and Dawson on administrative leave and no involvement in the decision to request an IA investigation of them.  ECF No. 28-3 at 28.  But he had been informed of the meeting and expressed concern about the "secret meeting" at the May 8 command staff meeting, and he had placed Chief Taylor on administrative leave for his role immediately and appointed Grant.

[11] This was Investigator Leadmon's first IA investigation.  Commander Schneider was his supervisor immediately before the IA, and Grant supervised the IA.

Deputy Chief Brown provided Leadmon notice of the names and possible policy violations.  ECF No. 33-10 at 20 (Leadmon Depo.).

The IA Report, dated August 14, 2018, begins with a background section stating that a "secret meeting" was held at Speck Pond on May 8, 2018, under the "false pretense" of a training exercise for the K-9 officers when instead, "the meeting was held to orchestrate a plan to have Commanders Grant and Schneider terminated from the Crestview Police Department."   ECF No. 28-11 at 1.   The report summarized the interviews conducted, including the following.  Temple stated he attended the meeting at Speck Pond because he received a text message from co-worker Seals, informing him of a meeting and stating it was "mandatory per Chief Taylor."[12]  ECF No. 28-11 at 9.  Others who attended said they too thought Chief Taylor had mandated the meeting based on that message.  Temple said he had spoken with K-9 Officer Marlar about the meeting the night before and that neither of them was aware of the purpose of the meeting.  When Temple arrived, Dawson handed him a manilla envelope with a list of approximately "thirty one harassment allegations committed against her by Commander Staff."  ECF No. 28-10 at 22 (IA interview transcript).  He said he glanced at it but gave it back to her because they were waiting for Chief Taylor to arrive.  Dawson was communicating with Chief

---

[12] Seals had sent the message by text or social media.  Seals also sent a screen shot of a map to help them find the location. Not all who received the message attended the meeting.

Taylor by text, and when she informed the group that Taylor said he had to attend a meeting with the Mayor and would not be joining them at Speck Pond, they all left. Temple said there was no real meeting; they sat around "shooting the bull" waiting for Chief Taylor to show up but he never did, so they left. *See* ECF Nos. 28-10 at 39 (IA interview transcript); 28-11 at 12 (IA Report). Leadmon asked Temple about why he had attempted to contact a former City employee by the name of Heather, to which Temple explained that she had a possible sexual harassment complaint against Brown. When asked about authorization to be on government property, Temple advised Leadmon that as former military, he had valid access to Eglin where Speck Pond is located. Temple stated he was off duty at the time, but he drove a marked City police vehicle, as did others.

Seals told Leadmon the meeting took place at Speck Pond because Dawson wanted to speak to a few trusted officers about some "issues" that she did not feel comfortable discussing at the department, "due to a possibility of retaliation" and she told him the meeting was "per Chief Taylor." ECF No. 28-11 at 12. Seals said he was not aware of any plan to disrupt the command staff of the police department; he had understood that "Taylor was coming out to the meeting to obtain statements from everyone so he could begin an investigation into the issues Officer Dawson had." *Id*. Dawson told Investigator Leadmon that she had been treated unfairly and discriminated against by Schneider and that "[t]he meeting had nothing to do with

overthrowing command staff or firing or anybody getting fired, or terminating, or anything, it had everything to do with personal reasons" of "getting relevant facts together" before she made a sworn statement for a complaint.  *Id.* at 19.

Marlar was reported as saying that Dawson showed up with "a list of stuff that basically we have all heard around here that was totally unfounded," and they talked about the K-9 positions and who would be getting a dog.  *Id.* at 2.  In his view, "the meeting was ridiculous" and should not have been "secret" "if there were legitimate concerns."  *Id.*  Ellrick also attended and stated Dawson had told him there was a K-9 training scheduled; "she wanted to over some things with everyone there" afterwards.  *Id.* at 3.

Rawles had not attended the meeting but said he heard from Reynolds that its purpose "was essentially to dig up dirt" to "get rid of" Commanders Grant and Schneider.[13]  *Id.* at 6.  Sergeant Brian McCallum gave a statement, saying he heard of the meeting from Ellrick, who had attended.  Based on text messages McCallum saw, he said it appeared that they were trying to have some kind of over-take . . . some kind of mutiny."  *Id.* at 5 (explaining that "the text thread ended with something to the effect of 'the time is now to act'").  The Report also included Schneider's statements that he had heard of the meeting from Rawles in advance and had received a call from Marlar afterwards.  He reported to Leadmon that Marlar told

---

[13] Reynolds also did not attend the meeting.

him Chief Taylor was involved but did not show up and that the meeting was "shady" and "designed to sabotage people at the agency." *Id.* at 6.

Based on these interviews, Leadmon concluded that the officers had held a meeting 18 miles outside of the City limits on Eglin Air Force Property without a permit; that some had used City vehicles to attend while off duty; that Seals had conducted unauthorized K-9 training outside of City limits and failed to notify his Commander of the training; and that these officers had "gathered in a secret meeting to conspire to have members of the command staff terminated for undetermined reasons." ECF No. 18-11 at 20. He "sustained" nine violations, listing Distraction to Others, Violating Laws Relating to the Police Department, Code of Ethics, Contributing to a Hostile Work Environment, and several numbered policy violations; the violations applied to Temple, Seals and Dawson. *See id.* at 21-22; *see also* ECF No. 33-17 (Notification of IA Conclusion).

On August 20, 2018, Temple sent a letter to Deputy Chief Grant to further explain his actions related to May 8, 2018, and to counter the accusation that he sought to overthrow and "dig up dirt" on command staff. ECF No. 28-12 at 1. Temple stated more than once, "It is my belief that I was to attend the meeting as an internal affairs investigator representative of the Professional Standards Division."[14]

---

[14] In addition, Temple noted that as an IA investigator, he had been instructed to be willing to meet potential complainants at a place of their choosing, because they may not feel comfortable making a complaint at the agency and was paid to "dig up dirt" using City time and City vehicles.

*Id.; see also id.* at 4 ("As I stated earlier, I believed I was to attend the meeting as an internal affairs representative."). Temple expressed that he had been unfairly characterized as a "ringleader" of something he was not involved in and complained that he was "potentially being terminated by a department that instigated an improper and Gestapoesque internal affairs investigation" in a retaliatory attempt to silence him and to protect command staff from investigation. ECF No. 28-12 at 5.

Also in this letter, Temple disclosed that before the Speck Pond meeting, he had met with the Mayor and discussed his concerns that Deputy Chief Brown was engaging in sexual harassment, which he said was his primary concern.[15] ECF No. 28-12 at 1. He further stated that about the same time, prior to the Speck Pond meeting, he had been "alerted to potential non-sexual harassment of Officer Dawson by Commander Schneider." ECF No. 28-12 at 2. Temple stated:

> I also believed it was my duty as an IA investigator to attend this meeting because about this time, I was learning more about the non-sexual harassment alleged by Officer Dawson from Commander Schneider. I had not met with her to gather any evidence. She was a primary attendee at this meeting, so I was unsure of what information she may have about any further harassment or if this meeting was even about her or the power struggle between the command staff.

---

[15] Temple detailed in the letter that Investigator Rawles had alerted him that "Deputy Chief Brown was engaging in sexual harassment of Heather Watson," a former employee. Temple also stated he had heard about other complaints of sexual harassment against Brown, as well as Brown's use of pornography on a work computer. ECF No. 28-12 at 1-2.

*Id.* at 3.   He concluded by again stating he had attended the meeting "as a representative of the Professional Standards Division;" not to take action against command staff.  *Id.* at 5.

### C.    IA Appeal and Termination

On August 23, 2018, Temple received a Notice of Intent to Terminate his employment, signed by Deputy Chief Grant, citing only the violations sustained in the IA report.  ECF No. 33-20.  Temple appealed the IA findings to Grant, again arguing his belief that he attended the meeting at the Chief's request and was authorized to be on Eglin property.  He also stated others had been untruthful during the investigation.  Grant denied the appeal on August 27, and Temple's employment was formally terminated as of August 28, 2018.  The final termination notice was based on both the IA violations and Grant's finding that Temple had been untruthful during the investigation.[16]  ECF No. 33-18.  Grant explained by affidavit that he initially intended to demote and suspend Temple without pay, until receiving Temple's letter, which he found inconsistent with Temple's testimony during the IA. Grant said Temple stated during the investigation that he was unaware of the reason for the Speck Pond meeting and had attended in an off duty capacity, whereas in his

---

[16] Grant signed the formal termination letter.  Although Mayor Cadle testified that he was not involved in the decision to terminate Temple, *id.* at 9, he also testified that he needed to be informed of and sign off on every hiring and firing, including Temple's termination, ECF No. 28-3 at 45-46.

August 20 letter, he "repeatedly stated that he had attended the meeting in his official capacity as an internal affair investigator and claimed it was his job duty to 'dig up dirt' on members of command staff." ECF No. 28-17 at 7. According to Grant, Temple would not have been terminated had he not sent the August 20, 2018, letter.[17] *Id.* Dawson also was terminated for untruthfulness during the IA investigation. Seals was suspended and demoted because, Grant explained, he made no inconsistent statements. ECF No. 28-17 at 8.

Temple explained by deposition that his statements were not inconsistent but explanatory. His August 20 letter had been an attempt to explain what had occurred. He had not known the purpose of the meeting before he attended, but once he learned it involved Dawson's complaints, Temple said he felt he was then present in an official capacity and should wait to hear her complaints when the Chief was present. ECF No. 33-1 at 24-25.

Temple filed suit alleging the City terminated his employment in retaliation for engaging in protected conduct because (1) he disclosed violations of rules and regulations to the Mayor, who could remedy the violations (Whistle-blower claim)

---

[17] Grant also sent the IA report to the Criminal Justice Standards and Training Commission, Professional Compliance Section, to initiate a disciplinary proceeding against Temple, but that case was dismissed on a finding that Temple's statements were not mutually exclusive and thus the evidence was insufficient to initiate a disciplinary proceeding. ECF No. 33-21.

and (2) he opposed discrimination of another based on her gender (claims under Title VII and the FCRA).[18]

## II.    Summary Judgment Standard

Summary judgment is appropriate where the record shows no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case."  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  A dispute of material fact is "genuine" if the record, taken as a whole, could persuade a reasonable jury to return a verdict for the nonmoving party.  *See id.* at 1260; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, courts view the evidence in the light most favorable to the nonmoving party, resolving all ambiguities and drawing all justifiable inferences in favor of that party but eschewing determinations of credibility and the weighing of evidence, which are functions properly left to a jury.  *See Frederick v. Sprint/United Mgm't Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001).

The moving party bears the initial burden of providing the basis for its motion and identifying materials evidencing an absence of a genuine dispute of material

---

[18] As a prerequisite to suit, Temple filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR") alleging retaliation in his termination.

fact. *See Celotex*, 477 U.S. at 323; *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 840 (11th Cir. 2000). In response, the nonmoving party must "go beyond the pleadings" and identify competent record evidence showing the existence of a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324. This requires identifying more than "[a] mere scintilla of evidence" in support of the non-moving party's claim; "there must be enough of a showing that the jury could reasonably find for that party." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson*, 477 U.S. at 252). The self-serving statement of a litigant can defeat summary judgment if it is based on personal knowledge and is not conclusory in nature. *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018). Summary judgment is warranted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.  Discussion

Retaliation against an employee for engaging in protected conduct is prohibited under Florida's Whistle-blower Act, Fla. Stat. § 112.3187 (Count I) and also under Title VII, 42 U.S.C. § 2000e-(3)(a) and the FCRA, Fla. Stat. § 760.10(7) (Counts II and III). The same basic analytical framework applies in each context. Thus, in a case of circumstantial evidence of retaliation, such as this, the basic

*McDonnell Douglas*[19] burden-shifting framework applies, requiring a showing that the plaintiff (1) engaged in a protected activity and (2) suffered an adverse employment action, (3) and a causal connection exists between the two.[20]  *See Jones v. United Space Alliance, LLC*, 494 F.3d 1306, 1310 (11th Cir. 2007) ("Florida courts apply Title VII caselaw when they interpret the FCRA"); *Rice-Lamar v. City of Fort Lauderdale*, 853 So. 2d 1125, 1131–33 (Fla. 4th DCA 2003) (establishing a *prima facie* case of retaliation under Florida's Public Whistle-blower Act is the same as under Title VII).  If the plaintiff establishes a prima facie case, then the employer (in both the discrimination context and the whistle-blower context alike) bears the burden to come forward with a legitimate, non-retaliatory reason for the adverse employment action.  *See Addison v. Fla. Dep't of Corr.*, 683 F. App'x 770, 775–76 (11th Cir. 2017) (unpublished[21]); *Sierminski v. Transouth Fin'l Corp.*, 216 F.3d 945, 950 (11th Cir. 2000).  Once the employer's burden is met, the burden of production shifts back to the employee to demonstrate that the proffered reason "is merely pretext for prohibited, retaliatory conduct."  *Sierminski*, 216 F.3d at 950.

---

[19]  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[20]  At the prima facie stage, the causation requirement is satisfied if the adverse action is not "wholly unrelated" to the protected activity.  *See Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134-35 (11th Cir. 2020) (Title VII); *Mitchell v. Young*, 309 So. 3d 280, 285 n.2 (Fla. 1st DCA 2020) (FCRA).

[21]  While unpublished opinions are not considered binding, they may be considered as persuasive authority.  *See* 11th Cir. R. 36-2; *see also United States v. Futrell*, 209 F.3d 1286, 1289 (11th Cir. 2000).

"Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee."  *Gogel v. Kia Motors Mfg. of Georgia, Inc*., 967 F.3d 1121, 1135 (11th Cir. 2020) (quoting *Sims v. MVM, Inc.,* 704 F.3d 1327, 1333 (11th Cir. 2013)).

The City moves for summary judgment on all claims, arguing that Temple cannot establish the elements of protected conduct and causation necessary to make out a prima facie case of retaliation,[22] and that, even if he could, Temple cannot demonstrate that the City's legitimate reason for termination was a pretext for retaliation.  Temple opposes the motion, arguing the existence of material disputes of fact. On careful review, the Court concludes, for reasons that follow, that questions of fact preclude summary judgment.

## A.    Protected Conduct

### 1.    Whistle-blower Protected Conduct

Under Florida's Whistle-blower's Act, in relevant part, public agencies are prohibited from retaliating "against any person who discloses information to an appropriate agency alleging improper use of governmental office, gross waste of funds, or any other abuse or gross neglect of duty on the part of an agency, public officer, or employee." Fla. Stat. § 112.3187(2).  To prevail on such a claim, a plaintiff must show that he "disclosed (1) protected information (2) to a protected

---

[22] There is no question that Temple suffered an adverse action because he was terminated.

recipient (3) in a protected manner." *Wagner v. Lee Cty.*, 678 F. App'x 913, 922

(11th Cir. 2017).  To be protected, the disclosure must include information about:

> (a) Any violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor which creates and presents a substantial and specific danger to the public's health, safety, or welfare.
>
> (b) Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, suspected or actual Medicaid fraud or abuse, or gross neglect of duty committed by an employee or agent of an agency or independent contractor.

*Id.* § 112.3187(5).  A protected recipient includes a chief executive officer or an

"other appropriate local official."  *Id.* § 112.3187(6); *see also Stanton v. Fla. Dep't

of Health*, 129 So. 3d 1083, 1084 (Fla. 1st DCA 2013) (noting "disclosure" to

supervisor was not sufficient without showing the supervisor "possessed the

necessary authority to investigate").   And the protected manners of making a

disclosure include disclosures made on an employee's own initiative provided in a

written and signed complaint and disclosures made when "requested to participate

in an investigation, hearing, or other inquiry conducted by any agency or federal

government entity."[23]  Fla. Stat. § 112.3187(7).  According to the Florida Supreme

Court, "the Act is remedial and should be given a liberal construction."  *Irven v.

Dep't of Health & Rehab. Servs.*, 790 So. 2d 403, 405 (Fla. 2001) (noting the cause

of action is inclusive and affords broad protections).

---

[23] Other circumstances are also listed but are inapplicable here.

On April 23, 2018, Temple made oral statements to Mayor Cadle about sexual harassment complaints against Brown and about Dawson's complaints of disparate treatment against Schneider.[24]  The City argues that these statements were not protected disclosures because they were not made pursuant to any investigation or inquiry but during an open door meeting.[25]  Temple argues there is a jury question as to whether his statements were made during an inquiry.  The Court agrees with Temple.  Despite the City's characterization of Temple's meeting with the Mayor as a voluntary, open door meeting, the record reflects that in April 2018, the Mayor was meeting with many officers and questioning them about their complaints and concerns about leadership and morale in the department.  Chief Taylor had instructed Temple to speak with the Mayor, and although Temple did not know the purpose of the meeting, he was questioned about the leadership of various command members, and he used this as an opportunity to state his concerns in response to the Mayor's inquiries.  While it is a close call, the Court concludes that whether Temple's

---

[24] As the City contends, Temple did not respond to the City's request for summary judgment with regard his sworn statement to Chief Taylor on May 9, 2018, or his written FDLE complaint.  These statements are undoubtedly protected conduct, but there is no evidence that either Grant or the Mayor was aware of them when Temple was terminated, and Temple does not argue otherwise.  Therefore, claims of retaliation based on these disclosures are deemed waived and also unsupported by the evidence for lack of a causal connection.

[25] There is no question Temple's statements included protected information or that the Mayor is a protected recipient and capable of investigating.

statements were made during an "inquiry" is a question of fact on this record.  *See generally Batz v. City of Sebring,* No. 17-14107-CIV, 2019 WL 11637131 at *15 n.6 (S.D. Fla. Mar. 21, 2019) (noting a question of fact as to whether a disclosure was made during a protected "inquiry" where the city contended it was merely an "informal workplace meeting," whereas the plaintiff said he was "summoned" to a "highly unusual" meeting where his "input" was solicited), *aff'd*, 794 F. App'x 889 (11th Cir. 2019); *Jones v. School Bd. of Orange County, Fla.*, No. 604CV540ORL31KRS, 2005 WL 1705504 at *10 (M.D. Fla. Jul. 20, 2005) (noting, without ruling, that a "troubleshooting meeting" with management may have been an "inquiry" as defined in Fla. Stat. § 112.3187(7)).

## 2.    Protected Conduct under Title VII and FCRA

Title VII protects employees from retaliation for opposing unlawful employment practices and for conduct of participating in an investigation or proceeding under Title VII.[26]  *See Gogel*, 967 F.3d at 1134.  Protected conduct thus includes not only filing a formal complaint but also voicing complaints informally, and in a reasonable manner, to a superior.  *Rollins v. State of Fla. Dep't of L. Enf't*,

---

[26] Title VII makes it unlawful to discriminate against an employee "because he has opposed any practice made an unlawful employment practice" under Title VII or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a).  Because the FCRA's language is patterned after Title VII, *see* Fla. Stat. § 760.10(7), no separate analysis is required. *See Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 n.1 (11th Cir. 2004).

868 F.2d 397, 400 (11th Cir. 1989).    An employee is protected when, both objectively and subjectively, there was "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Techs., Carrier TransiCold Div.*, 103 F.3d 956, 960 (11th Cir. 1997); *see also Rollins*, 868 F.2d at 400.

The City argues that Temple's statements opposing discrimination towards Dawson are not protected under Title VII and the FCRA because the alleged wrongful conduct was not "sexual" in nature and did not rise to the level of a hostile work environment.   The Court disagrees.   As Temple argues, his comments to the Mayor were not intended to show a hostile work environment but instead indicated that a supervisor was treating Dawson differently than male officers in that she was denied training, whereas a male was selected to attend the training instead.   *See* ECF No. 33-1 at 14-15 (Excerpts Temple Depo.).   Temple also disclosed a complaint accusing Deputy Chief Brown of sexual harassment against a former employee.   A jury could conclude that Temple engaged in protected conduct under Title VII and the FCRA by disclosing these complaints of differential treatment and sexual harassment in a good faith belief that the conduct violated federal and state anti-discrimination laws.

### B.    Causal Connection

The remainder of the retaliation analysis is the same for all claims, and thus the claims are not analyzed separately.  The City argues that a causal connection is lacking between the protected conduct and Temple's termination.  Again, the Court disagrees.  At the prima facie stage, causation is satisfied if the decisionmaker was aware of the conduct and the adverse action is not "wholly unrelated" to the protected activity.  *See Gogel*, 967 F.3d at 1134-35 (Title VII); *Shannon v. Bellsouth Telecomms., Inc*., 292 F.3d 712, 716 (11th Cir. 2002); *Mitchell v. Young*, 309 So. 3d 280, 285 n.2 (Fla. 1st DCA 2020) (FCRA); *Fla. Dep't of Children & Families v. Shapiro*, 68 So. 3d 298, 306 (Fla. 4th DCA 2011) (whistle-blower's claim).  Close temporal proximity alone can establish the necessary causal connection, but if it is not "very close," other evidence is required to establish the connection, and a delay of three to four months between the two events is considered substantial.  *See Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007).  In the absence of close temporal proximity, a series of adverse employment actions commenced shortly after protected conduct may establish causation.  *See Entrekin v. City of Panama City Fla*., 376 F. App'x 987, 996 (11th Cir. 2010) (noting an IA investigation leading to placement on administrative leave and ultimately termination rises above "trivial harms" and would dissuade a reasonable worker

from making a charge of discrimination); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998).

Viewing the evidence in Temple's favor, there is an unbroken series of events from which a jury could conclude that Temple's termination was not wholly unconnected to his statements opposing discrimination.  He informed the Mayor of discrimination complaints against Schneider and Brown on April 23, 2018; Temple attended the Speck Pond meeting on May 8, which concerned Dawson's complaints and of which command staff was aware in advance; and on May 10, Grant suspended Temple for attending the Speck Pond meeting, where Dawson had attempted to discuss her complaints against Schneider.  The IA investigation began the same day. The IA investigation resulted in a finding of violations on August 14, 2018, and Grant said he intended to suspend and demote Temple for attending the Speck Pond meeting until he received Temple's letter dated August 20.  In that letter, Temple expressly referenced his meeting with the Mayor, as well as Dawson's discrimination complaints against Schneider and complaints of harassment against Brown.  On August 23, three days after receiving Temple's letter, Grant signed the notice of termination and Temple was formally terminated on August 28.  Although Grant contends he was not aware of Temple's meeting with Mayor Cadle and that he alone made the termination decision, there is evidence of a command staff meeting close in time to the disclosure, the meeting with the Mayor was referenced

in the August 20 letter to Grant, and there also is evidence that the Mayor had to sign off on the termination decision.  Given this intertwined chain of events, the Court cannot conclude on this record that Temple's termination is wholly unrelated to his protected conduct of disclosing and opposing discrimination.

### C.    Legitimate Reason and Pretext

The burden then shifts to the City.  The Court agrees with the City that it has presented a legitimate explanation for the termination based violations sustained in the IA Report and Grant's determination that Temple had been untruthful during the investigation.  Nonetheless, a question of fact exists on pretext.

To determine if there is a question of fact on pretext, the court must "evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Tonkyro v. Sec'y, Dep't of Veterans Affs*., No. 19-10014, 2021 WL 1115445, at *11 (11th Cir. Mar. 24, 2021)  (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  A showing of pretext requires "both that the reason was false, and that [retaliation] was the real reason."  *Gogel*, 967 F.3d at 1136 (quoting *Springer v. Convergys Customer Mgmt. Grp. Inc*., 509 F.3d 1344, 1349 (11th Cir. 2007)).  Ultimately, the plaintiff claiming retaliation "must establish that his or her protected activity was a but-for cause of the alleged

adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *see also Gogel*, 967 F.3d 1121, 1136 n.13 (applying the but-for standard at the pretext stage); *Chaudhry v. Adventist Health Sys. Sunbelt, Inc*., 305 So. 3d 809, 816–17 (Fla. 5th DCA 2020) (applying the but-for standard to whistle-blower claims); *Palm Beach Cty. Sch. Bd. v. Wright*, 217 So. 3d 163, 165 (Fla. 4th DCA 2017) (applying the but-for standard to FCRA retaliation claims).

The record in this case is replete with inconsistencies and contradictions from which a reasonable jury could find the City's explanation unworthy of credence. Temple presented evidence that the IA investigation is plagued with discrepancies that discredit its conclusions. The initial background statement in the IA Report is not an objective statement but begins by characterizing the Speck Pond meeting as a "secret meeting" held under "a false pretense" to "orchestrate a plan" to have Grant and Schneider terminated. The conclusion relied on statements and characterizations of the meeting as "mutiny," or for the purpose of "digging up dirt" on command staff to get them fired, made by individuals who were not present.  Those who attended said that Dawson tried to discuss her complaints but little of substance was discussed (aside from who would be getting a K-9 dog), and there was no testimony of any conversation that could be considered as mutiny or a conspiracy to have a

commander fired.[27]   That characterization of the meeting was presented only by Reynolds, Rawles, McCallum and Schneider—none of whom had attended the meeting.  Seals, who was not found untruthful by Grant and was not terminated, stated that the meeting was for Dawson to speak about issues related to her differential treatment by Schneider that she did not want to discuss at the department for fear of retaliation.[28]   Yet, the IA Report concluded:  "Statements reveal these officers gathered in a secret meeting to conspire to have members of the command staff terminated for undetermined reasons."  ECF No. 28-11 at 20.

In addition, there is inconsistency in the termination decision.  The timing shows that Grant first intended only to suspend Temple based on the IA violations, but three days after receiving Temple's August 20 letter, which referenced his meeting with the Mayor and the discrimination complaints he disclosed, Grant sent a termination notice.  Also, the initial termination notice referenced only the IA violations whereas the final termination notice added a finding of untruthfulness to justify the termination, based solely on the August 20 letter.  Moreover, viewing all

---

[27]  Marlar said the meeting was "ridiculous" and "sketchy."  It was Schneider who characterized Marlar's comments as indicating the meeting was "designed to sabotage people at the agency," ECF No. 28-11 at 6, but Marlar did not say this under oath.  Instead, he said Dawson had a "list of stuff she was basically alleging against Commander Schneider and Commander Grant," and that these were things he had heard before and thought were unfounded, *id.* at 2.

[28]  A jury could attribute the difference in treatment to the fact that Seals stated in his interview that he found Dawson's complaints of differential treatment to be insubstantial whereas Temple's letter and his prior consistent disclosures to the Mayor indicate he took seriously the complaints of discrimination against Schneider and Brown.

inferences in Temple's favor, Temple's statements in the letter were offered to explain how he viewed his role at the Speck Pond meeting and could be viewed as not mutually exclusive of his sworn statements during the investigation.

Although "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions," *Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1244 (11th Cir. 2001), the timing, the inconsistencies and discrepancies on this record, and the intertwined nature of the whole series of events with complaints of discrimination, calls into question the legitimacy of the IA Report's conclusions and the finding of untruthfulness on which the City based its termination decision.  Therefore, there is a question of fact on pretext, and whether Temple would not have been terminated but for his statements in opposition to discrimination allegedly perpetrated by Brown and Schneider is a question of fact for the jury.

Accordingly, the City of Crestview's Motion for Summary Judgment, ECF No. 30, is **DENIED**.  Trial will be scheduled by separate order.  The case is referred to the assigned Magistrate Judge to conduct a settlement conference within forty-five (45) days.

**DONE AND ORDERED** this 31st day of March 2021.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**